# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ST. PAUL MERCURY INSURANCE COMPANY,
as subrogee of Johnson International a.k.a.
Johnson Financial Group d.b.a. Johnson Bank,

        Plaintiff,

    v.                               Case No. 04-C-1124

THE VIKING CORPORATION,

        Defendant.

---

**DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ON MOTIONS TO STRIKE PLAINTIFF'S AND DEFENDANT'S EXPERT TESTIMONY**

---

## I. PROCEDURAL AND FACTUAL BACKGROUND

On September 30, 2004, the plaintiff, St. Paul Mercury Insurance Company ("St. Paul"), commenced this action by filing a complaint in the Circuit Court for Racine County, Wisconsin asserting claims based on tort, breach of warranty, and false advertisement under Wis. Stat. § 100.18. On November 18, 2004, the defendant, The Viking Corporation ("Viking"), removed this action to the United States District Court for the Eastern District of Wisconsin on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1441.

The plaintiff's complaint contains four counts. Counts I and II assert tort claims based on negligence and products strict liability. Count III asserts a claim for breach of warranty. Count IV asserts a claim for violation of Wis. Stat. § 100.18, the Wisconsin Deceptive Trade Practices Act.

Currently pending before the court is the defendant's motion for summary judgment, the defendant's motion to strike plaintiff's expert testimony, and the plaintiff's motion to bar opinion testimony from John Gland. Each of these motions is fully briefed and ready for resolution. For the reasons which follow, the defendant's motion to strike plaintiff's expert testimony and the plaintiff's motion to bar opinion testimony will be denied as moot. This is because the defendant's motion for summary judgment will be granted.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment was also accompanied by a set of proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment and the plaintiff's motion for partial summary judgment.

Viking is a Michigan corporation that designs and manufactures fire protection sprinklers, valves, and devices. (Answer at ¶ 3.) On October 25, 2002, a Viking brand sprinkler activated at the Johnson Bank in Racine, Wisconsin causing water damage to the bank building. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1.) St. Paul alleges that it is subrogated to the rights of its insured, Johnson Bank, and is entitled to amounts it paid on behalf of Johnson Bank to repair the water damage. (DPFOF ¶ 4.)

The sprinkler that activated was a Viking Quick Response 155° Horizontal Sidewall Sprinkler. (DPFOF ¶ 2.) Since 1995, Viking has manufactured approximately 1 million sprinkler heads like the one involved in this case. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 31.)

2

The water caused damage to the interior of the Johnson Bank building and its contents. (DPFOF ¶ 3.) There was no fire at the time of the subject sprinkler's activation. (PPFOF ¶ 1.) At the time of the subject sprinkler's activation, no one besides security personnel was known to be in the building. (PPFOF ¶ 2.)

Fire suppression sprinklers are designed to work in conjunction with a fire protection system to release water in case of a fire to control or extinguish the fire. (DPFOF ¶ 5.) Sprinklers are attached to pipes that contain and distribute water throughout the system. (DPFOF ¶ 6.) Each sprinkler has a waterway that allows water to flow through the sprinkler when it opens. (DPFOF ¶ 7.) The waterway of the sprinkler is sealed closed by force transmitted from a compression screw through a glass bulb onto a seal over the sprinkler opening. (DPFOF ¶ 8.) The glass bulb is designed to burst and release the water seal when it is exposed to its predetermined operating temperature. (DPFOF ¶ 9.) The bulb bursts due to the expansion of the fluid inside the bulb. The fluid is present inside the bulb along with an air bubble. (DPFOF ¶ 10.)

The air bubble is precisely sized to determine the temperature at which the bulb will burst. As the temperature rises, the fluid inside the glass bulb expands. (DPFOF ¶ 11.) When the temperature reaches the operating temperature of the bulb, the bubble is displaced. (DPFOF ¶ 12.) Continued heating will cause continued expansion of the fluid which causes the glass bulb to burst, releasing the seal to allow water to flow from the pipes onto the fire.[1] (DPFOF ¶ 13.)

---

[1] The plaintiff objects to this proposed finding of fact as overly vague. The plaintiff contends that the sprinkler was intended to activate at 155 degrees Fahrenheit. (Pl.'s Response to DPFOF ¶ 13.)

3

Viking manufactures both standard response sprinklers and quick response sprinklers. Both are listed with Underwriters Laboratory.[2] (DPFOF ¶ 14.) The sprinkler at issue is a quick response sprinkler. These sprinklers are required by standards for buildings where it is important to deliver water in the early stages of a fire. (DPFOF ¶ 15.)

Sprinklers are susceptible to mechanical damage from improper storage, improper installation, or subsequent misuse. (DPFOF ¶ 17.) Such mechanical damage can cause sprinklers to activate outside of the presence of heat. (DPFOF ¶ 18.)

Johnson Bank, as the Construction Agent for First Security Bank, National Association as the Owner Trustee under the Johnson Bank Trust (referred to herein as "Johnson Bank"), contracted with Mortenson Construction to build the Johnson Bank building. (DPFOF ¶ 21.) Mortenson in turn hired subcontractors to build various components of the bank building. (DPFOF ¶ 22.) As part of the agreement between Johnson Bank and Mortenson, Mortenson provided a one year warranty to Johnson Bank on the building and materials of the Johnson Bank building. (DPFOF ¶ 24.)

Mortenson contracted with a subcontractor, Wenninger, to install the fire suppression system. (DPFOF ¶ 26.) The subcontractor agreement between Mortenson and Wenninger included a one year warranty on the fire suppression system. (DPFOF ¶ 27.) The warranties from Mortenson to Johnson Bank and from Wenninger to Mortenson ran from May 2002 to May 2003. (DPFOF ¶ 28.) Viking has produced copies of warranty claims from customers who bought sprinkler heads. (PPFOF ¶ 16.)

---

[2] The parties dispute whether both types of sprinklers comply with Underwriters Laboratory standards.

4

Viking did not manufacture the pumps, pipes, or valves within the Johnson Bank fire suppression system. (DPFOF ¶ 36.)

The fire suppression system was tested before it was placed in service. (PPFOF ¶ 17.)

Viking's Technical Operations Manager, George Wirsch ("Wirsch"), testified in his deposition that there are only four causes for a sprinkler head to activate: (1) heat; (2) mechanical trauma; (3) ice in the line; or (4) defects in the workmanship or materials for the sprinkler head. (PPFOF ¶ 3.) Wirsch further testified that he saw no evidence of improper installation, and no signs of mechanical trauma to the sprinkler head that could have caused activation. (PPFOF ¶ 19-20.) The plaintiff contends that Wirsch admitted that he had eliminated all potential causes with the exception of a defect in workmanship or materials. (PPFOF ¶ 4.) The defendant contends that Wirsh only testified that he did not see any evidence of a manufacturing defect or evidence of other causes of activation. (Def.'s Resp. to PPFOF ¶ 4.) The plaintiff also contends that Wirsch acknowledged it was impossible to inspect the glass bulb because the glass bulb destroys itself upon activation. (PPFOF ¶ 5.)

The defendant's expert, John Gland, testified that he saw no issues with the sprinkler's installation. (PPFOF ¶ 21.)

The plaintiff's expert, John Mertens, testified in his deposition that he believed that a defect in the sprinkler head's bulb most likely led to the sprinkler activation. (PPFOF ¶ 6.) His opinion of defect is based on the elimination of other possible causes for the sprinkler activation. (DPFOF ¶ 48.) Mertens testified that he saw no evidence to suggest that storage or installation contributed to the unprovoked activation. (PPFOF ¶ 18.) However, Merten's own report states that improper installation or handling could have caused the activation. (DPFOF ¶ 53.)

5

Mertens testified that he did not believe the subject sprinkler was defectively designed. (DPFOF ¶ 11.) Mertens further testified that he has no opinion that Viking failed to perform tests it should have or failed to adequately perform any tests. (PPFOF ¶ 40.) Furthermore, he testified that he has no opinion that Viking's warnings were defective. (PPFOF ¶ 41.)

Mertens did not perform any testing to determine whether his hypothesized manufacturing defect existed. (DPFOF ¶ 49.) Mertens also did not compare the design specifications to the manufacture of the sprinkler. (DPFOF ¶ 50.) He did not interview or speak with anyone with knowledge of the installation of the fire suppression system. (DPFOF ¶ 54.) Mertens did not investigate the conditions under which the sprinkler was stored prior to installation. (DPFOF ¶ 55.)

Mertens has a professional engineering license in Wisconsin and Illinois, and has owned his own fire protection company for approximately 20 years. (PPFOF ¶ 7-8.) Mertens' company, Fyresafe Engineering, primarily offers forensic engineering services for catastrophic losses. (PPFOF ¶ 9.) Mertens has taught numerous university level classes at his alma mater on the issues presented in this case, including systems and hydraulic design, layout and equipment. (PPFOF ¶ 10.) Mertens has also taught numerous seminars, including "Adequacy and Reliability of Fire Safety Systems" seminar, which addressed design issues and failure issues with fire protection systems, predominantly sprinkler systems. (PPFOF ¶ 11.) Mertens has been analyzing failure modes of sprinklers since 1976. From June of 1976 to August of 1978, Mertens was employed at Factory Mutual, a company that, among other things, analyzed failure modes associated with sprinkler heads-many times for the manufacturers themselves, such as Kidde and Ansul. (PPFOF ¶ 12.)

Johnson controlled and directed the type of building that was built. Johnson also paid for all the work and materials used to construct the building. (PPFOF ¶ 24.) Johnson did not attempt to

6

interfere with technical issues regarding construction, as those decisions were left up to the companies that were hired to do the actual construction. (PPFOF ¶ 25.)

During the course of construction of the Johnson facility, the defendant provided materials regarding its sprinkler, which indicate that the sprinkler comes with a warranty. (PPFOF ¶ 28.) It was Johnson's expectation that high quality products would be used in the construction of the building, which products would come with appropriate warranties. (PPFOF ¶ 29.)

Viking has not raised the economic loss doctrine as an affirmative defense at any time prior to filing its motion for summary judgment. (PPFOF ¶ 27.)

## II. SUMMARY JUDGMENT

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252). Put another way, "a litigant is entitled to summary judgment if, should the case go to trial on the record compiled in the summary judgment proceedings, he would be entitled to judgment as a matter of law." *Walker v. Abbott Laboratories*, 416 F.3d 641, 645 (7th Cir. 2005).

8

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.  DISCUSSION

Viking moves for summary judgment arguing that the plaintiff's claims fail on all counts. Specifically, Viking argues that the plaintiff's tort claims fail as a matter of law because St. Paul cannot prove essential elements of its tort claims, the tort claims are barred by the economic loss doctrine, and the plaintiff's expert opinions and testimony are inadmissible.  Viking also argues that the plaintiff's warranty claim fails for lack of privity.  Lastly, Viking argues that the plaintiff's false advertising claim fails because there is no evidence that Johnson Bank ever received or relied on any information provided by Viking in connection with any decision to purchase Viking sprinklers.  The parties seem to be in agreement that Wisconsin law governs the resolution of each of these arguments.

**A. Tort Claims**

The plaintiff alleges negligence in Count I of its complaint.  St. Paul claims that Viking owed a duty to its customers and members of the public, including Johnson Bank, to use reasonable care in the design, manufacture, and/or distribution of the fire protection system, including the sprinkler heads.  (Compl. at ¶ 12.)  The plaintiff contends that Viking breached this duty in one or more of the following ways:

> (a)    improperly designing, manufacturing and/or distributing the fire protection systems which Viking knew or should have known were prone to a foreseeable hazard of spontaneously bursting;

9

(b)     supplying a dangerous and defectively designed, manufactured and/or distributed product which it knew, or should have known, subjected Johnson and its real and personal property to an unreasonable risk of harm;

(c)     failing to equip the subject sprinkler head with adequately and properly designed components so that it could be used safely for the purposes for which it was intended;

(d)     failing to provide proper, adequate and effective warnings of the hazard of a sprinkler head malfunctioning, which Viking knew or should have been aware of;

(e)     failing to properly inspect the subject fire protection system and all of its components before releasing it into the stream of commerce;

(f)     failing to hire competent agents, servants and/or employees to perform the design, manufacture and distribution of the subject sprinkler head and its component parts;

(g)     failing to equip the subject sprinkler head with adequate and properly functioning controls, components and other regulatory and/or safety devices, so as to insure the safe use of the product;

(g) otherwise failing to exercise due care under the circumstances.

(Compl. at ¶ 13.)

St. Paul claims that as a direct and proximate result of the negligence, carelessness, and/or recklessness of Viking, Johnson Bank sustained severe and extensive damages to its real and personal property.

There are four elements of a negligence claim: "(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Antwaun A. v. Heritage Mut. Ins. Co.*, 228 Wis. 2d 44, 55, 596 N.W.2d 456, 461 (Wis. 1999).

The defendant contends that the plaintiff cannot prove either breach of duty or causation. In support of that contention, Viking points to the deposition testimony of John Mertens ("Mertens"),

10

the plaintiff's expert. The defendant argues that in his testimony Mertens stated that he could not point to a specific reason why the sprinkler activated, or to anything Viking did or did not do to cause the activation. (Def.'s Br. at 11.) Viking contends that, as a result of this testimony, the plaintiff can point to no evidence to support its negligence claim, and that the plaintiff can only ask the jury to speculate as to the cause of the activation.

St. Paul contends that direct proof is not required where the product in question is destroyed or damaged beyond being able to make a determination of the cause of the event. (Pl.'s Br. at 11.) Rather, the plaintiff argues that, where the event destroyed any evidence of the claimed defect, circumstantial evidence, which allows the trier of fact to infer that a defect caused the damaging event, is proper to prove product liability. (Pl.'s Br. at 11.)

The plaintiff cites various cases to support its position. *See, e.g., Rennick v. Fruehauf Corp*, 82 Wis. 2d 793, 264 N.W.2d 264 (Wis. 1978); *Weir v. Federal Ins. Co.*, 811 F.2d 1387 (10th Cir. 1987); *Union Ins. Co. v. RCA Corp.*, 724 Pac.2d 80 (Co. App. 1986); *Ayres v. Sears, Roebuck & Co.*, 789 F.2d 1173 (8th Cir. 1986). St. Paul also cites various treatises as support. *See, e.g.*, 63B Am.Jur.2d Products Liability § 1791 at 311 (1997) ("the plaintiff in a products liability case may rely on circumstantial evidence to prove that a product is defective and that the product was defective at the time it was sold or left the possession of the manufacturer, even where the product is consumed in the use that resulted in the plaintiff's injury"); 63 Am.Jur.2d Products Liability §608 at 495 (1996); 4A Am.Law Prod. Liab. 3d Circumstantial Evidence § 54:5, at 13-14.

In *Weir*, the court held that the existence of a defect in a television set destroyed by a fire could be proven through circumstantial evidence. 811 F.2d at 1392. The court reasoned that in cases in which direct proof of defect was unattainable, "[a] ruling that proof of defect is unattainable as a

11

matter of law in circumstances such as these would effectively establish a conclusory presumption of non-liability in favor of strict product liability defendants whose products self-destruct in the process of causing injury to persons or property." *Id*. Consequently, the court declined to adopt such a view. *Id*.

Viking concedes that essential elements of a claim may be proved by circumstantial evidence. However, Viking contends that circumstantial evidence still must provide support for the plaintiff's claim of negligence, and that the plaintiff's evidence in this case requires the jury to speculate that the sprinkler activation was somehow caused by Viking's actions. (Def.'s Br. at 12.); *see Solar v. Kawasaki Motor Corps*, 221 F. Supp. 2d 967, 971 (E.D. Wis. 2002) ("Essential elements may be proved by circumstantial evidence; however, that evidence must have probative value to support a legal inference rather than speculation. It is never enough to present evidence that would require the jury to engage in speculation or conjecture." (citing *Merco Distributing Corp. v. Commercial Police Alarm Co.*, 84 Wis. 2d 455, 460, 267 N.W.2d 652 (Wis. 1978)).

In the case at hand, St. Paul's inability to present direct evidence to prove negligence does not defeat its claim. Direct evidence is not required (much less even posssible), as the bulb in the subject sprinkler was completely destroyed by the activation. Rather, St. Paul can use circumstantial evidence in the form of expert testimony to prove its claim of negligence. At issue is the reliability and adequacy of the plaintiff's expert testimony, which will be discussed below. However, because the circumstantial evidence offered by the plaintiff's expert testimony constitutes an elimination of other potential causes of the activation in order to reach his conclusion, the only viable theory under which the plaintiff could ultimately proceed is *res ipsa loquitur*.

12

Viking contends that the plaintiff cannot proceed under the theory of *res ipsa loquitur*. In Wisconsin, this theory applies in cases in which:

> (a) either a laymen is able to determine as a matter of common knowledge or an expert testifies that the result which occurred does not ordinarily occur in the absence of negligence, (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant, and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event.

*Peplinski v. Fobe's Roofing*, 193 Wis. 2d 6, 17, 531 N.W.2d 597, 601 (Wis. 1995) (quoting *Lecander v. Billmeyer*, 171 Wis. 2d 593, 601-602, 492 N.W.2d 167, 170-71 (Wis. 1992).

Viking argues that *res ipsa loquitur* is inapplicable in this case because the sprinkler was not within Viking's exclusive control. The defendant contends that various factors which could have caused the sprinkler activation, namely installation, storage, handling, and maintenance, were all outside of Viking's control. (Def.'s Br. at 13.)

The plaintiff argues that Wisconsin law permits the application of *res ipsa loquitur* in product liability cases where the defect cannot be specifically identified. (Pl.'s Br. at 13.) St. Paul cites *Rennick* in support of its position. 82 Wis. 2d at 799. In *Rennick*, there was no evidence that an accident was caused by a specific defect in a dump truck which overturned. *Id*. However, the court held that it was appropriate to allow a jury to draw a *res ipsa loquitur* inference when the "'unexplained event is combined with evidence rebutting the existence of other probable causes.'" *Id*. (quoting *Powers v. Hunt-Wesson Foods, Inc.*, 64 Wis. 2d 532, 540, 219 N.W.2d 393, 396 (Wis. 1974). Further, the court stated that "a res ipsa type of inference is enough to establish a defect if the plaintiff can show that he was properly using the product and can negative other possible causes of the product failure since it left the manufacturer's control." *Id*. (quoting *Jagmin v. Simonds Abrasive Co.*, 61 Wis. 2d 60, 73, 211 N.W.2d 810 (Wis. 1973). The "'[plaintiff] need not negative entirely

the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not.'" *Id*. (quoting William L. Prosser, The Law of Torts 242 (4th ed. 1971)).

In the case at hand, I am satisfied that, were this case to proceed to trial, the plaintiff should be allowed to proceed under the theory of *res ipsa loquitur*. To be sure, the sprinkler was not in the defendant's exclusive control in a strictly literal sense. Other factors outside of Viking's control could have caused the sprinkler activation. However, as the Wisconsin Supreme Court has stated, "[t]hough the requirement of exclusive control in the defendant has been frequently stated by this and other courts, the courts do not give this requirement a strict literal interpretation." *Hoven v. Kelble*, 79 Wis. 2d 444, 452, 256 N.W.2d 379, 383 (Wis. 1977). Rather, it requires that "'other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence.'" *Id*. (quoting Prosser, The Law of Torts, at 219-221).

The plaintiff in this case is attempting to establish that the sprinklers were in the defendant's exclusive control by presenting evidence eliminating all other potential causes of the activation. Under Wisconsin law, this is a permissible application of the doctrine of *res ipsa loquitur*. The plaintiff has expert testimony which provides evidence to rebut the existence of other probable causes. As the defendants do not contest that the other requirements of *res ipsa loquitur* are met, and since the plaintiff has presented evidence to support its position that the sprinkler was within Viking's exclusive control, St. Paul should be allowed to proceed under the theory of *res ipsa loquitur*.

14

The defendant also claims that the plaintiff's strict liability claim fails as a matter of law. Under the theory of strict products liability, a manufacturer is liable for the harm caused by a product to the consumer or user if:

> (1) the product was in defective condition when it left the possession or control of the seller, (2) it was unreasonably dangerous to the user or consumer, (3) the defect was a cause of the plaintiff's injuries or damages, (4) the seller engaged in the business of selling such product (it was not an isolated transaction unrelated to the principal business of the seller), and (5) the product was one that the seller expected to, and that did, reach the user or consumer without substantial change in the condition it was in when he or she sold it.

*Tanner v. Shoupe*, 228 Wis. 2d 357, 365-66, 596 N.W.2d 805, 811 (Wis. Ct. App. 1999) (citing *Dippel v. Sciano*, 37 Wis. 2d 443, 460, 155 N.W.2d 55, 63 (Wis. 1967).

Viking contends that the plaintiff cannot meet the first or third elements of a strict liability claim because it cannot identify a specific defect that caused the activation. However, as discussed above, the plaintiff can rely on the theory of *res ipsa loquitur* to establish liability. As such, although the plaintiff lacks direct evidence of a defect, St. Paul (were this case to proceed to trial) should be allowed to proceed under its strict liability claim with evidence negating other potential causes outside of a manufacturing defect.

**B. Motion to Strike the Plaintiff's Expert Testimony**

The defendant has filed a motion to strike the testimony of the plaintiff's expert, John Mertens. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

15

The trial judge is to exercise gate-keeping responsibility with respect to the admission of expert testimony and opinions, and thereby "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). The court "must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id*. at 592. This determination involves "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93.

*Daubert* provides a list of four factors to be used in determining the soundness of the methodology: "(1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (citing *Daubert*, 509 U.S. at 594-95).

However, this list of four factors is non-exclusive and does not constitute a definitive checklist or test. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Rather, regardless of the specific factors used, the lower court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152. In making this determination, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*.

16

The defendant argues that Mertens' testimony is inadmissible because his opinion is not based on data or testing and fails to take into account factors he himself considers significant. (Def.'s Br. at 19.) Furthermore, Viking questions whether Mertens is even qualified to give an opinion that the sprinkler was defectively manufactured, and claims that Mertens admitted in his testimony that he is not an expert in sprinkler manufacturing. (Def.'s Br. at 22.)

Viking further argues that Mertens' opinion that the sprinkler activated because it was defective lacks support from his own data or testing of the sprinkler in question. Viking points to Mertens' deposition testimony in which he admits that he cannot identify a manufacturing defect that caused the sprinkler activation, and did not perform any testing to determine whether his hypothesized manufacturing defect existed. (Def.'s Br. at 21-22.) Viking also contends that Mertens failed to compare the design specification with the sprinkler in question. (Def.'s Br. at 22.)

Viking acknowledges that Mertens' opinion is primarily based on eliminating other possible causes of the sprinkler activation. However, Viking contends that, even assuming that Mertens' process of elimination methodology is scientific, his testimony is wholly unreliable because it is not supported by sufficient facts or data. Specifically, Viking argues that Mertens failed to investigate significant potential causes of the sprinkler activation and thus cannot reliably testify that, based on his process of elimination methodology, the activation was caused by the sprinkler. (Def.'s Br. at 23.)

Viking points to Mertens' failure to investigate whether the sprinkler was damaged during storage prior to installation. (Def.'s Br. at 23.) Mertens did not interview or speak with anyone with knowledge of the Johnson Bank fire suppression system. (Mertens Dep. at 131.) Mertens also did not personally investigate the conditions under which the sprinkler was stored prior to installation.

17

(Mertens Dep. at 131-34.) Indeed, in his report Mertens lists improper installation or handling as a potential cause of sprinkler activation. (Gulbransen Aff., Ex. G., p. 3, ¶ 8.) Moreover, Viking also points to Mertens' failure to investigate whether testing of the fire suppression system was ever performed. (Def.'s Br. at 24; Mertens Dep. at 155-56.)

In response, plaintiff St. Paul argues that Mertens' testimony is admissible because it is scientific and reliable. St. Paul points to Mertens' testimony that he saw no evidence to suggest that storage or installation contributed to the sprinkler activation. (Mertens Dep. at 64-65, 133.) In addition, St. Paul notes that the defendant's own Manager of Technical Operations, George Wirsch, testified that he did not see any issues with the sprinkler installation. (Wirsch Dep. at 84.) Further, the plaintiff points to the deposition of the defendant's own expert, John Gland, who testified that there were no issues with the sprinkler's installation and that the damage must have occurred after it was installed. (Gland Dep. at 67-8.)

St. Paul also contends that Mertens' failure to investigate whether there was testing of the fire suppression system is a non-issue. St. Paul notes that there is sufficient evidence outside of Mertens' testimony showing that the system was actually tested. (Pl.'s Br. at 9; PFOF 17; Thorn Aff., Ex. G at ¶ 4.) Additionally, according to Mertens' deposition testimony, the installer of the sprinkler would have been in violation of state law if the testing had not been performed. (Mertens Dep. at 156.)

The plaintiff relies on *Rudd v. General Motors* to support its argument that Mertens' methodology of process of elimination of other potential causes is reliable. 127 F. Supp. 2d 1330 (M.D. Ala. 2001). In *Rudd*, a mechanical engineer testified that a fan blade which failed was defective, and arrived at this conclusion through a process of elimination. *Id.* at 1343. The expert eliminated other potential causes of the fan failure by noting that the driver's operation of the truck

18

prior to the fan failure was normal behavior, that the fan blade was not bent prior to the accident, and that the driver's pre-accident operation of the truck would not have caused a non-defective fan to fail. *Id*. 1340. As a result, the expert concluded with a "reasonable degree of engineering certainty" that the fan blade must have contained a microscopic defect. *Id*. The expert then eliminated post-manufacture causes for the microscopic defect, leading to his ultimate conclusion that a manufacturing defect caused the fracture in the fan. *Id*. at 1342. The defendant contended that the expert's testimony should be inadmissible, pointing to the expert's concession that he did not find any direct evidence of a manufacturing defect. *Id*.

However, the court held that the expert's testimony was reliable because he provided "a step-by-step and transparent account of the explanations he has considered, the physical indicia he associates with each possible alternative cause, and his reasons for excluding each of the alternative causes." *Id*. at 1344. The expert did not "rest simply on his authority as an expert; rather, each time [the expert] relies upon his experience, he 'explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' *Id*. (quoting Fed. R. Evid. 702, advisory committee's notes, 2000 amendment).

Moreover, the expert had a sufficient factual basis for his conclusions. *Id*. He visually inspected other fans, visually inspected the fan in question, including scrutiny of the fan for physical indicia of alternative explanations for failure, examined testimony about the use history of the fan and truck, read publications and case studies, and relied on his own past experience and training in analyzing metal fractures. *Id*. The court also found the methodology of process of elimination reliable, as the court noted that "[i]nference chains built upon such circumstantial evidence are a well-established feature of admissible expert testimony." *Id*. at 1343. Furthermore, a

19

specialty-publication's model failure analysis upon which the expert relied contained a process of elimination analysis. *Id*.

St. Paul argues that the facts in this case are substantially similar to those in *Rudd*. Like the expert in *Rudd*, Mertens is an experienced expert in the field of system failure who formed his conclusions through a method of process of elimination. The defendant, however, argues that the cases are distinguishable. Viking contends that, unlike the expert in *Rudd*, Mertens did not provide a step-by-step account of how he came to his conclusions, but rather rested on his authority as an expert and assumed his ultimate conclusion.

As an initial matter, it is my opinion that Mertens is qualified to testify as an expert on the issue of potential sprinkler malfunction. Although the defendant questions whether Mertens is an expert in sprinkler manufacturing, his experience indicates that he does possess the proper knowledge, skill, experience training, or education to testify on these matters. Mertens has analyzed sprinkler failure since 1976 in various capacities. He was privy to internal research while working at Factory Mutual analyzing sprinkler head failures, and has observed glass bulbs fail absent an external cause. (Mertens Dep. at 109-10.)

At greater issue is whether Mertens' specific testimony regarding sprinkler failure is inadmissible because it is unreliable. Specifically, the issue at hand is whether Mertens' methodology and his application of this methodology are sufficiently reliable to render his testimony admissible.

To begin, the methodology of process of elimination is reliable. As discussed above, in the absence of direct evidence of a manufacturing defect, circumstantial evidence can be used to prove liability. In the case at hand, there is no direct evidence of defect because the glass bulb shatters on

activation, leaving behind no testable physical evidence to directly determine if there was a manufacturing defect. It logically follows that the only way by which a manufacturing defect can be proven is through eliminating other potential causes of activation. Moreover, Viking's Technical Operations Manager, George Wirsch, testified in his deposition that there are only four causes for a sprinkler head to activate. Given this limited realm of possible causes of sprinkler failure, there is no reason why eliminating the other three causes would not lead to a reliable finding that a manufacturing defect was the cause.

To be sure, St. Paul has not pointed to any outside sources verifying that process of elimination is an accepted methodology when ascertaining the cause of a sprinkler failure. However, as noted in *Rudd,* there is nothing inherently unreliable about the methodology of process of elimination. Indeed, given that under Wisconsin law it is appropriate to allow a jury to draw a *res ipsa loquitur* inference when the unexplained event is combined with evidence negating the existence of other probable causes, it appears appropriate in this case to allow for evidence negating other potential causes of the activation. Neither side has presented evidence indicating that there is any method available for determining directly whether the activation was due to a manufacturing defect. Rather, both sides have presented experts whose testimony focuses on the possibility, or lack of possibility, of there being causes for the activation outside of a manufacturing defect.

Having concluded that the general methodology of process of elimination is reliable, there still remains the issue of whether Mertens' application of this methodology is sufficiently reliable to warrant admissibility of his testimony. The court concludes that Merten's application of this methodology to the facts in the instant case was sufficiently reliable to render his testimony admissible.

To be sure, Mertens did not exhaustively investigate all potential causes of activation outside of a manufacturing defect. He did not perform testing to determine if there was a manufacturing defect, investigate whether there was testing of the fire suppression system by the installer, compare design specifications to the actual manufacture of the sprinkler, interview individuals with knowledge of the Johnson Bank fire suppression system, or interview anyone associated with Wenninger, i.e., the contractor responsible for the sprinkler system. That he did none of this, however, should not lead to the barring of his testimony.

As to the lack of testing by Mertens to determine if there was a manufacturing defect, there is no indication that this type of testing was even possible. In fact, Mertens is relying on process of elimination precisely because there is no testing available to directly determine if a manufacturing defect existed. Such being the case, Mertens' failure to perform testing on the subject sprinkler is immaterial to the issue of whether his application of the process of elimination methodology was reliable.

Moreover, Mertens' failure to investigate whether the installer performed tests of the sprinkler system is immaterial to whether his opinion is sufficiently reliable. Mertens formed his opinion with an understanding that the testing had been performed, and there is no dispute in this case as to whether the testing was actually performed. (See PPFOF ¶ 17.)

Mertens bases his opinion on his elimination of other potential causes outside of a manufacturing defect, which he details in his report and in his deposition testimony. These other potential causes, as also identified by Viking's Technical Operations Manager, George Wirsch, were (1) heat; (2) mechanical trauma; or (3) ice in the line. (PPFOF ¶ 3.) Mertens eliminated heat or ice as a potential cause based on his first-hand observation of potential heating sources, as well as the

22

record that there was no fire. (Mertens Dep. at 23-25, 54.) He eliminated improper system pressure as a potential cause based on his first-hand observation of the pipes, and his general knowledge of proper pressure standards in sprinkler systems. (Mertens Dep. at 28-36.)

Mertens also eliminated different potential causes of mechanical trauma as the cause. He examined the sprinkler and the surrounding area to determine if the sprinkler could have been struck and damaged by an outside object. (Mertens Dep. at 37.) He also interviewed individuals at Johnson Bank to determine if anyone had access to the sprinkler at the time of activation. (Mertens Dep. at 51.)

Although Mertens failed to interview individuals who might have had knowledge relating to whether the sprinkler was improperly installed or stored, his opinion as to this issue is still supported by other facts and data. Mertens bases his opinion on the fact that he saw no evidence of installation issues on his own inspection of the subject sprinkler. (Mertens Dep. at 58.) He looked at wrench and plier marks to determine if there were indications of tool slips or other marks indicating contact with the bulb. (Mertens Dep. at 63-65.) Moreover, Mertens corroborated his finding that installation was not a cause with other literature as well as other deposition testimony. (Mertens Dep. at 78.) This includes the testimony of George Wirsch, who testified that he did not see any evidence of improper installation, mechanical failure, or heat or ice. (Wirsch Dep. at 83-84.)

In sum, Mertens' proposed expert testimony is sufficiently reliable to be admissible. It is based on sufficient facts and data, and would assist the trier of fact to understand or determine a fact in issue.

**C. Plaintiff's Motion to Bar Opinion Testimony from John Gland**

Plaintiff St. Paul has filed a motion to bar John Gland ("Gland") from testifying as an expert for the defendant in this matter. St. Paul argues that Gland's proposed testimony fails both prongs of the *Daubert* test. First, the plaintiff contends that Gland is not qualified to testify about the manufacturing of the subject sprinkler head, and that his opinions are only based on speculation. Second, the plaintiff argues that Gland's opinions would not assist the trier of fact because they are not relevant and they invade the province of the jury. (Mot. Bar Opinion Test. Pl. Br. at 10.)

St. Paul contends that Viking has not established that Gland is competent to testify that there are no manufacturing defects in the subject sprinkler. St. Paul argues that, outside of helping Viking develop a better adhesive tape, Gland has no experience in the manufacturing of sprinkler heads, and no experience working with fire protection systems. (Mot. Bar Opinion Test. Pl. Br. at 11.) Furthermore, although Gland has worked on three other sprinkler activation cases in the past, the plaintiff contends that he either could not determine why they failed or could not remember the case at all.

In response, Viking contends that Gland's training and experience qualifies him to give opinion testimony regarding his microscopic examination of the subject sprinkler and his conclusions based on that examination. (Mot. Bar Opinion Test. Def.'s Br. at 6.) Gland holds a Ph.D in physical chemistry, and is an expert in applying microscopy to interpret physical phenomena. He performed work similar to his examination of the sprinkler head while employed at Exxon and GM. Specifically, he examined metal materials for damage and defects and to determine the meaning of the damage marks. (Mot. Bar Opinion Test. Def.'s Br. at 7; Gland Dep. at 39-40.) Viking also cites various scientific articles Gland has published describing his analysis of surfaces using microscopy,

Case 2:04-cv-01124-WEC   Filed 01/12/07   Page 24 of 46   Document 46

his work consulting with Viking on its sprinkler manufacturing process, and his use of microscopy to examine sprinklers for defects (Mot. Bar Opinion Test. Gland Dep. at 40-41, 26-28, 7.)

In my opinion, the defendants have adequately established that Gland is competent to testify. Gland is qualified as an expert in analyzing surfaces for defects using microscopy. Although he does not specialize in examining sprinklers and fire suppression systems, he does have experience from performing work on three other sprinkler activation cases in the past. Moreover, his lack of knowledge of sprinkler manufacturing or fire suppression systems does not disqualify him from offering testimony regarding whether he saw evidence of defect on the sprinkler surface. Gland is not testifying as to the potential causes of the activation. He is simply testifying as to whether he saw any evidence of damage or defect using microscopy.

St. Paul also contends that Gland's proposed testimony is based on nothing more than speculation. Specifically, the plaintiff argues that Gland's proposed testimony that there were no manufacturing defects present in the subject sprinkler is simply speculation and is contrary to the physical evidence in the case. (Mot. Bar Opinion Test. Pl.'s Reply at 5.) St. Paul contends that, because the bulb's failure and subsequent activation would destroy all evidence of a defect, Gland cannot eliminate the possibility of a defect in the glass bulb. The plaintiff points to Gland's deposition testimony in which, after being asked if he could eliminate a defect in the glass bulb, he responds: "No. I can't eliminate it. Actions of the–on or with the glass bulb causing the activation, I can't eliminate that." (Gland Dep. at 89.) As a result of this testimony, the plaintiff argues that Gland's failure to include and expressly eliminate the glass bulb as a cause of the failure dooms his entire analysis. (Mot. Bar Opinion Test. Pl.'s Reply at 5.)

25

In response, Viking argues that Gland is testifying regarding the conclusions which he formed using accepted scientific techniques. The defendant notes that conclusions based on observations and experience are not excluded by the *Daubert* analysis. *Citing Kumho*, 526 U.S. at 156. Viking points to Gland's deposition testimony in which he states that his work in examining activated sprinklers is based on his knowledge of materials and microscopy, and that he has written articles specifically about his analysis of materials through the use of microscopy. (Gland Dep. at pp. 40-41.)

Further, Viking argues that Gland's methodology in forming his opinions is sufficiently reliable to be admissible under *Daubert*. The defendant details the methodology used by Gland, which included taking photographs of the subject sprinkler and an exemplar spinkler, analyzing and comparing the photographs to note differences, and constructing a timeline based on the marks he noted on the subject sprinkler. (Gland Dep. at pp. 60-65.) Viking contends that Gland formed his opinion based on observable evidence through microscopic analysis and comparison, rather than through speculation.

Moreover, Viking argues that it is not the defendant's burden to prove the cause of activation. *See Fuchsgruber v. Custom Accessories, Inc.*, 244 Wis. 2d 758, 768, 628 N.W.2d 833, 837 (Wis. 2001). As such, Gland has not set out to eliminate all potential causes of activation or prove why the sprinkler activated, since this is the plaintiff's burden to show. Rather, Gland has taken the available evidence, examined it using scientific techniques, and explained his findings. (Mot. Bar Opinion Test. Def.'s Br. at 10.)

In my view, Gland's testimony is sufficiently reliable to be admissible, as it is more than just mere speculation. His testimony is based on his first-hand observations using a reliable methodology. Gland's findings are based on observable evidence, and he details the basis for his

26

opinions. Although he is unable to expressly eliminate the glass bulb as a potential source of the sprinkler failure, this is immaterial as to whether his proposed testimony is sufficiently reliable to be admissible. At issue is the reliability of Gland's opinion regarding whether there was evidence of damage or defect in the sprinkler head.

The plaintiff also argues that Gland's opinions would not assist the trier of fact. Specifically, St. Paul contends that Viking has not produced enough evidence to convince a reasonable juror that its expert's opinion is more likely true than not true. (Mot. Bar Opinion Test. Pl.'s Br. at 12.) St. Paul cites *Rotman v. National Railroad Passenger Corp.* to support its contention that where an expert witness testifies that a causal relationship is possible, conceivable, or reasonable, that opinion, without more, does not satisfy the burden of producing legally sufficient proof that a fact is more likely true than not true. 669 N.E. 2d 1090, 1092 (Ct. App. Mass. 1996).

St. Paul contends that Gland's two opinions concerning the activation of the sprinkler heads should be barred because Gland only testified regarding what may have happened, and does not state that his opinions are more likely true than not true. Namely, Gland's opinions are that fibers on the sprinkler head suggest that inappropriate activities near the glass bulb may have contributed to the activation, and that damage observed on the wrench boss, if it occurred prior to the activation, may have contributed to the activation. (Mot. Bar Opinion Test. Pl.'s Br. at 12.)

In addition, St. Paul argues that Gland's testimony would not assist the trier of fact because the opinions that he expresses are nothing more than his own observations. Stated another way, St. Paul contends that Gland is not testifying to anything more than what is obvious to any layperson. The fibers are easily visible to the naked eye, and two experts, Mertens and Wirsch, determined that they played no role in the activation. (Mot. Bar Opinion Test. Pl.'s Reply Br. at 9.) As a result,

27

Gland's testimony should be barred because "[a]n expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (quoting *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 205 (7th Cir. 1982).

Viking responds that Gland identified foreign fibers near the pre-activation location of the glass bulb which the plaintiff's expert failed to identify. As such, Gland's testimony will assist the jury in identifying evidence which is relevant to the issue of whether a manufacturing defect caused the activation. Viking contends that Gland is the only witness who compared the subject sprinkler to an exemplar sprinkler, and should be allowed to testify to the findings of his analysis. Further, Viking argues that, since Viking does not have the burden of proving what caused the activation, Gland's testimony should be admitted to refute the plaintiff's claim of a manufacturing defect and the plaintiff's expert's opinion that there is no evidence to suggest any other possible causes of activation. (Mot. Bar Opinion Test. Def.'s Br. at 12.)

St. Paul replies that allowing expert testimony which contains otherwise inadmissible evidence to refute the plaintiff's expert is improper, as it would confuse the jury. Rather, the proper vehicle for Viking to challenge St. Paul's expert testimony is cross-examination. Further, St. Paul contends that Viking has the burden of proving that the damages were caused by consumer abuse. *See e.g., City of Soughton v. Thomasson Lumber Co.*, 675 N.W.2d 487, 98 (Wis. Ct. App. 2003) (burden is on the breaching party to establish its affirmative defenses); *Int'l Motors Inc. v. Ford Motor Co.*, 754 A.2d 1115 (Md. App. 2000) (in a subrogation case, the manufacturer had the burden of persuasion on its defense that a post-sale modification caused the loss.). As such, Gland must

28

testify in terms of probabilities rather than possibilities. (Mot. Bar Opinion Test. Def.'s Reply Br. at 8.)

In my opinion, Gland's proposed testimony would be of sufficient assistance to the trier of fact to warrant its admissibility. Although Gland is unable to state with absolute certainty that outside factors caused the activation, his observations are based on scientific analysis and on his experience in locating damage and defect. Moreover, he is not testifying in order to pinpoint the exact cause of the activation. Rather, his testimony is on the issue of whether there exists evidence suggesting that factors outside of manufacturing defect caused the activation. As such, his testimony is that it is more likely true than not that there exists physical evidence on the sprinkler which would indicate an outside cause.

In regards to which party has the burden of proof, as to the tort claims the plaintiff has the burden of proving that the manufacturing defect caused the activation. As a result, Gland's testimony is being used to refute the plaintiff's expert testimony that there exists no evidence of causes for the activation outside of a manufacturing defect. For the breach of warranty claim, Viking is not conceding that there was a breach of warranty and is not using Gland's testimony to assert an affirmative defense. Rather, Viking is using Gland's testimony to refute the plaintiff's claim that there was a breach, as there is no breach if something outside of Viking's control caused the activation.

Furthermore, Gland is not testifying to something which is obvious to any layperson. Although the fibers near the pre-activation location may be visible to the naked eye, a layperson would be unable to decipher the impact these fibers could have on sprinkler activation. Gland is offering testimony based on his experience and his microscopic analysis of the fibers, which are

29

matters that are relevant to the issue of whether there is evidence indicating that the cause of the activation was not a manufacturing defect. In sum, Gland is providing useful information that would otherwise be unavailable to the trier of fact. For that reason, his testimony would be admissible.

Unfortunately for the plaintiff, however, and for the reasons set forth below, the question of whether the parties' respective expert testimony would be admissible is rendered moot by the fact that none of the plaintiff's claims can survive summary judgment.

### D. The Economic Loss Doctrine and The Plaintiff's Tort Claims

The economic loss doctrine is "a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen v. Cedarapids, Inc*., 216 Wis. 2d 395, 400, 573 N.W.2d 842, 844-45 (Wis. 1998). The application of the economic loss doctrine to tort claims between commercial parties is based on three policies, which are not affected by the presence or absence of privity between the parties: "(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against that risk." *Id*. at 403, 573 N.W.2d at 846. The economic loss doctrine is particularly applicable "where the warranty given by the manufacturer specifically precludes the recovery of such damages." *Van Lare v. Vogt, Inc*., 274 Wis. 2d 631, 640, 683 N.W.2d 46, 51 (Wis. 2004).

"By definition economic loss excludes claims for personal injury and damage to other property." *Id*. at 405, 573 N.W.2d at 847. This is because "[r]ecovery of economic loss is intended solely to protect purchasers from losses suffered because a product failed in its intended use." *Id*.

Therefore, "the general duty of care to refrain from acts unreasonably threatening physical harm is not paralleled by any comparable duty when the harm threatened is merely economic." *Id.* "A manufacturer in a commercial relationship has no duty under either negligence or strict liability theories to prevent a product from injuring itself." *Id.* In contrast, "[t]he law imposes tort duties upon manufacturers to protect society's interest in safety from the physical harm or personal injury which may result from defective products." *Linden v. Cascade Stone Co.*, 283 Wis. 2d 606, 614, 699 N.W.2d 189, 193 (Wis. 2005) (quoting *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 248, 593 N.W.2d 445, 452 (Wis. 1999)).

Factors which can weigh in favor of the application of the economic loss doctrine include: "[t]he written, bargained-for nature of the contract; the sophistication of the parties; the commercial nature of the transaction; the representation of the parties by counsel; and the fact that the parties had the opportunity to bargain for a warranty, the available remedies, and the allocation of risk." *1325 N. Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, ¶ 28, 716 N.W.2d 822, 832 (Wis. 2006).

Defendant Viking argues that the case at hand is "'tailor made for the application of traditional contract law.'" (Def.'s Br. at 14) (quoting *T-3 Group*, 2006 WI 94 at ¶ 28, 716 N.W.2d at 832). Viking contends that Johnson Bank negotiated and agreed to contract remedies with its building contractor, Mortenson. Further, as part of the agreement between Johnson Bank and Mortenson, Mortenson provided for a one year warranty on the building's construction. Viking argues that allowing St. Paul to pursue tort claims on behalf of Johnson Bank would give Johnson Bank a remedy in addition to the benefit of the bargain to which Johnson Bank and Mortenson already agreed. (Def.'s Br. at 15.)

31

Further, Viking argues that this case does not fall into the category of "damage to other property," to which the economic loss doctrine does not apply. Viking contends that the warranty between Johnson Bank and Mortenson was for the entire bank building, and thus the product in this case is the bank building itself rather than simply the sprinklers. As such, water damage to the interior of the building constitutes damage to the product itself, and not damage to other property. Moreover, the defendant claims that any damage to other property within the Johnson Bank building was incidental and not significant enough to take this commercial dispute outside the application of the economic loss doctrine. (Def.'s Br. at 15.)

Viking supports its argument that the building itself, rather than the sprinklers, was the product by pointing to the doctrine of the "integrated system." (Def.'s Br. at 15.) The Wisconsin Supreme Court has held that "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss doctrine." *Wausau Tile*, 226 Wis. 2d at 249, 593 N.W.2d at 452.

The defendant cites *Bay Breeze Condominium Ass'n v. Norco Windows, Inc.* to support its contention that the bank building was the integrated system and that the alleged failure of a component, the sprinkler, did not cause damage to other property for purposes of the economic loss doctrine. 257 Wis. 2d 511, 651 N.W.2d 738 (Wis. Ct. App. 2002). In *Bay Breeze*, a condominium association brought suit against a window manufacturer claiming the windows were negligently designed and installed, resulting in water damage to the inside and outside of the units and between the interior and exterior walls. *Id*. at 515, 651 N.W.2d at 740. The Court of Appeals affirmed the circuit court's dismissal of the case, holding that "the economic loss doctrine applies to building construction defects when, as here, the defective product is a component part of an integrated

32

structure or finished product." *Id*. at 527, 651 N.W.2d at 746. The court noted that the homeowners had purchased the condominiums as a finished product, and the quality fell below their expectations. *Id*. The interior and exterior walls and casements were simply other component parts in a finished product, with no function apart from the condominiums for which they were manufactured. *Id*. at 528, 651 N.W.2d at 746. As there were bargained for remedies in the event the windows failed to perform as expected, the court reasoned that allowing the plaintiffs to recover in tort what are essentially contract damages due to the product's failure to perform as expected would give the plaintiffs an "end run around the terms of the parties' contract." *Id*.

The defendant also cites *Grams v. Milk Products, Inc*., which discusses the expansion of the integrated system concept using the "disappointed expectations" test. 283 Wis. 2d 511, 699 N.W.2d 167 (Wis. 2005). In *Grams*, the plaintiffs claimed that the poor nutritional content of a milk substitute caused poor growth and a higher mortality rate for their calves. *Id*. at 517-518, 699 N.W.2d at 170. The Wisconsin Supreme Court affirmed the lower courts' rulings that the economic loss doctrine barred the plaintiff's tort claims. *Id*. at 519, 699 N.W.2d at 170. Noting that the "integrated system" concept does not translate well to every situation involving property damage to which the economic loss doctrine logically applies, the court applied the disappointed expectations test. *Id*. at 528, 699 N.W.2d at 175. In the disappointed expectations test, the economic loss doctrine bars tort recovery for harm that does not go beyond disappointed expectations. *Id*. at 531, 699 N.W.2d at 177. Put another way, "the economic loss doctrine will apply when 'prevention of the subject risk was one of the contractual expectations motivating the purchase of the defective product.'" *Id*. at 534, 699 N.W.2d at 178.

33

The defendant argues that the case at hand qualifies under the disappointed expectations test. Viking contends that Johnson Bank bargained for a building that included a fire suppression system, with expectations that the fire suppression would only activate in the case of a fire to prevent damage to the building. The activation of the fire suppression system was a disappointment of this expectation, a disappointment of expectation which does not bring the tort claims outside the economic loss doctrine. (Def.'s Br. at 18.) Viking argues that, rather than pursuing tort remedies, Johnson Bank and St. Paul should have pursued contractual remedies. More specifically, Johnson Bank should have asserted a warranty claim directly against the building contractor for the sprinkler activation, or St. Paul should have pursued such a claim on behalf of Johnson Bank after paying for the water damage.

Finally, the defendant cites to cases indicating that damage to other property does not necessarily create an exception from the economic loss doctrine, particularly in cases in which the amount of damage is small. *See Rich Products Corp. v. Kemutec, Inc.*, 66 F.2d 637, 971 (E.D. Wis. 1999) (damage to a relatively small amount of other property does not lift a claim away from contract and into tort law); *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 576 (7th Cir. 1990) ("[i]ncidental property damage [] will not take a commercial dispute outside the economic loss doctrine.").

In response, the plaintiff does not address the question of whether this case falls into the "other property" exception of the economic loss doctrine. Rather, the plaintiff contends that Viking has waived this defense by failing to raise economic loss as an affirmative defense in its first responsive pleading. (Pl.'s Br. at 16.) Under Fed. R. Civ. P. 8(c), the "failure to plead an affirmative defense results in a waiver of that defense." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir. 1991); *see also LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 922 (7th Cir. 1997).

34

Further, the plaintiff argues that Viking has taken contradictory positions, which makes application of the economic loss doctrine inappropriate. Namely, St. Paul contends that Viking cannot argue both that it is not liable in tort and that there is no contract. (Pl.'s Br. at 17.) According to the plaintiff, because tort liability is available when there is no contract, Viking cannot argue both that there is no contract and that St. Paul is barred from its tort claims by the economic loss doctrine. Rather, one of these remedies must be available to impose liability on the manufacturer of a defective product.

In reply, Viking contends that the economic loss doctrine is not a waiveable affirmative defense. Instead, Viking argues that the economic loss doctrine is a basis for the defense of failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(h)(2). (Def.'s Reply at 3.) According to the defendant, because it pled failure to state a claim upon which relief can be granted as an affirmative defense, its right to assert the economic loss doctrine as a defense to the plaintiff's tort claims was preserved. In addition, Viking contends that the defense of failure to state a claim is appropriately considered on a motion for summary judgment. (Def.'s Reply at 3.); *see Kornblum v. St. Louis County*, 48 F.3d 1031, 1038 (8th Cir. 1995).

Moreover, Viking argues that the economic loss doctrine is not encompassed in the list of waiveable defenses set forth under Fed. R. Civ. P. 12(h)(1), as it is not a defense of lack of personal jurisdiction, of improper venue, or of insufficiency of process. Viking notes that no court has held that the economic loss doctrine is an affirmative defense which must be pled in an answer under Fed. R. Civ. P. 8(c). (Def.'s Reply at 3.) Rather, Viking cites decisions in which courts have held that the economic loss doctrine is not waived if not pled in an answer under Rule 8(c). *See Tampa Bay*

35

*Storm, Inc. v. Arena Football League, Inc.*, 1998 WL 182418, *1 (M.D. Fla. 1998); *Kalmes Farms Inc. v. J-Star Industries, Inc.*, 2004 WL 114976, *3 (D. Minn. 2004).

Viking emphasizes the difference between affirmative defenses under Rule 8(c) and the defense of failure to state a claim. The defendant notes that it is improper to bring a motion to dismiss under Rule 12(b) based on an affirmative defense under Rule 8(c). *See McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006) ("it is incorrect to grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense"). Further, Viking asserts that the economic loss doctrine need not be pled as an affirmative defense because courts regularly decide motions to dismiss under Rule 12(b)(6) based on the economic loss doctrine. *See Dow v. Poltzer*, 364 F.Supp. 2d 931, 941 (E.D. Wis. 2005). As such, Viking contends that it naturally follows that if it is appropriate to raise the economic loss doctrine in a motion to dismiss under Rule 12(b)(6), then this particular defense is not waived if not pled as an affirmative defense. (Def.'s Reply at 5.)

Turning to the plaintiff's argument that the economic loss doctrine does not apply in the absence of a contract, Viking contends that the doctrine applies regardless of whether or not there is a contract between the manufacturer and the commercial purchaser. (Def.'s Reply at 6.) Viking cites *Daane*n to support this contention. 216 Wis. 2d at 400, 573 N.W.2d at 844-45. The plaintiff in *Daanen* operated several quarries, and as part of its operations crushed and sold rock that it removed from the quarries. *Id.* at 397-98, 573 N.W.2d at 843. The plaintiff bought a component part for a rock crusher from one of the defendant's distributors, which component eventually caused the rock crusher to break down. *Id.* at 398, 573 N.W.2d at 844. The warranty did not pass to the plaintiff. *Id.* at 398, 573 N.W.2d at 844. In *Daanen*, the court held that "[u]nder Wisconsin law, the economic loss doctrine bars a remote commercial purchaser from recovering economic losses from

36

a manufacturer under tort theories of strict liability and negligence, even in the absence of privity." *Id*. at 418, 573 N.W.2d at 852. In concluding that the economic loss doctrine applied despite the lack of privity, the court reasoned that the plaintiff's claims failed to "implicate any tort law concerns with unreasonably dangerous products or public safety." *Id*. at 406, 573 N.W.2d at 847. Rather, the claim involved "contract law concerns with failed economic expectations." *Id*. at 406, 573 N.W.2d at 847.

As an initial matter, this court finds that Viking's failure to raise economic loss as an affirmative defense in its first responsive pleading does not lead to a waiver of this defense. The economic loss doctrine is not an affirmative defense which can be waived under Fed. R. Civ. P. 12(h)(1). Moreover, as noted by Viking, courts regularly decide motions to dismiss under Rule 12(b)(6) based on the economic loss doctrine. Given that it is improper to grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense, it logically follows that the economic loss doctrine is not an affirmative defense which must be pled as such. Further, the plaintiff has not provided any support for its argument that the economic loss doctrine is an affirmative defense which is waived if not pled in an answer under Rule 8(c).

In addressing the plaintiff's next argument, this court is persuaded that the absence of privity does not necessarily preclude the application of the economic loss doctrine. The Wisconsin Supreme Court has made it clear that the economic loss doctrine can be applied despite a lack of privity between the parties. Rather than looking at whether privity of contract existed between the two parties, the court looks at whether the claim involved "contract law concerns" with "failed economic expectations." *See Daanen*, 216 Wis. 2d at 406, 573 N.W.2d at 847.

As such, to the extent that St. Paul is arguing that, if there is no contract, then there has to be tort liability, it is wrong. The economic loss doctrine can apply even in the absence of a contract

37

between the two parties.  Such being the case, Viking has not necessarily taken contradictory positions by arguing that it cannot be liable under either tort or contract theories.

Moreover, the defendant is not arguing that St. Paul has no remedies available, or even that there is no contract in this case.  Rather, the defendant is arguing that any contract which existed was between Johnson Bank and Mortenson, rather than between Johnson Bank and Viking.  Therefore, the proper avenue for relief for Johnson Bank was a claim against Mortenson under the warranty agreement between Mortenson and Johnson Bank.  For the reasons set forth below, I agree.

Johnson Bank and Viking bargained for and signed a contract for a complete building.  As part of the bargained for agreement between Johnson Bank and Mortenson, Mortenson provided a one year warranty to Johnson Bank on the building and materials of the Johnson Bank building.  This warranty was agreed upon by both Johnson Bank and Mortenson to insure against the risk of a defect in the building.  Damage due to a faulty sprinkler system would seem to be covered by this warranty. Indeed, as noted by Viking, Johnson Bank has pursued another warranty claim directly against Mortenson for a foundation issue in the building.  (Def.'s Br. at 15; Thorn Dep. at 17-19.)

Given that the contract in question involves Johnson Bank and Mortenson, the plaintiffs, as in *Bay Breeze*, purchased the building as a finished product, and the sprinkler system is but one of the component parts in that finished product.  After all, the sprinklers have no function apart from the building for which they were purchased. And, although the water may have damaged parts of the building other than the sprinkler system itself, that sprinkler system was still part of the integrated system.   Thus, just as the defective window which caused damage to the interior of the condominiums in *Bay Breeze* fell within the economic loss doctrine, so too does the allegedly defective sprinkler which caused damage to the interior of the bank building fall within the economic

38

loss doctrine. Simply stated, there was no damage to other property, as there was only damage to the building itself, i.e. the finished product.

In sum, under the disappointed expectations test, this case falls within the economic loss doctrine. Johnson Bank purchased a bank building with the expectation that it would be built with quality materials and with working security and safety systems. The failure of the sprinkler system resulting in damage to the building constituted a failed economic expectation.

In conclusion, and for all of the foregoing reasons, the plaintiff's tort claims under negligence and strict liability are barred by the economic loss doctrine. Consequently, the defendant's motion for summary judgment on the plaintiff's tort claims will be granted.

## E. Warranty Claim

The plaintiff's third claim is for breach of express and implied warranties. Viking contends that this claim should be dismissed because Viking had no contractual relationship with Johnson Bank.

"Wisconsin law requires privity of contract between the parties before liability can be founded on breach of express or implied warranty." *Twin Disc, Inc. v. Big Bud Tractor, Inc*., 582 F. Supp. 208, 215 (E.D. Wis. 1984) (citing *Paulson v. Olson Implement Co.*, 107 Wis. 2d 510, 319 N.W.2d 855 (1982); *LaCrosse v. Schubert, Schroeder & Associates, Inc.*, 72 Wis. 2d 38, 240 N.W.2d 124 (1976)). "Privity of contract 'is the relation that exists between two . . . contracting parties,' and in cases of defective products this privity of contract is usually that between buyer and seller." *La Crosse*, 72 Wis. 2d at 41, 240 N.W.2d at 126 (quoting *Wrenshall State Bank v. Shutt*, 202 Wis. 281, 283, 232 N.W. 530 (Wis. 1930).

39

The plaintiff does not dispute that privity of contract is required for an express or implied warranty claim. However, St. Paul argues that the subcontractor that purchased the sprinklers from Viking, to wit, Wenninger, was an agent of Johnson Bank. (Pl.'s Br. at 15.)

"'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *James W. Thomas Constr. Co. v. Madison*, 79 Wis. 2d 345, 352, 255 N.W.2d 551, 554 (Wis. 1977) (quoting Restatement 2d, Agency, sec. 1(1)). The primary elements required to support a finding of agency are: (1) "'the express or implied manifestation of one party that the other party shall act for him;' and (2) "'who has retained the right to control the details of the work.'" *Peabody Seating Co. v. Jim Cullen, Inc.*, 56 Wis. 2d 119, 123, 201 N.W.2d 546, 549 (Wis. 1972) (quoting *Boehck Construction Equipment Corp. v. Voigt*, 17 Wis. 2d 62, 68, 69, 115 N.W.2d 627, 630 (Wis. 1962).

St. Paul argues that Wenninger was acting as Johnson Bank's agent when it purchased the sprinkler heads from Viking. St. Paul notes that the building was specifically built for Johnson Bank by Mortensen, and the sprinkler system was installed by Wenninger. St. Paul contends that Johnson Bank controlled and directed the type of building that was built, and paid for all the work and materials used in the construction of the building. Although Johnson Bank did not interfere with technical issues regarding the construction, as those decisions were left to the companies hired by Johnson Bank, the work was nevertheless performed at the direction and on the behalf of Johnson Bank. (Pl.'s Br. at 15.)

St. Paul points to Wisconsin construction law to support its contention that Johnson Bank was really the party purchasing the sprinkler heads from Viking. Under Wis. Stats. § 779.01, any entity

that provides materials for an improvement to real property has a lien on all of the interest in the land belonging to the land owners until that entity is paid. St. Paul argues that, if Johnson Bank were not the real party purchasing the sprinkler heads, there would be no reason under § 779.01 to give Viking the right to place a lien on Johnson Bank's building. (Pl.'s Br. at 15.) According to the plaintiff, it logically follows that Johnson Bank was the entity that purchased the sprinkler heads and that it is entitled to all warranties that came with the sprinkler. (Pl.'s Br. at 16.)

Moreover, St. Paul argues that Viking has always treated this matter as involving a warranty issue. St. Paul contends that Viking sent a letter to Johnson Bank acknowledging the warranty, and then, after completing its examination of the sprinkler, sent a letter denying liability under a warranty theory. (Pl.'s Br. at 16.)

In response, Viking argues that Johnson Bank never had any contractual relationship with Viking, and that St. Paul has not presented any evidence to support a finding of agency or apparent authority on behalf of Wenninger to contractually bind Viking to Johnson Bank. (Def.'s Reply at 10.) Viking cites *Peabody* to support its contention that there is no evidence of Johnson Bank's manifestation that Wenninger would act as Johnson Bank's agent.

In *Peabody*, the court held that there was no agency relationship between American and Peabody, where American was the exclusive distributor for Peabody in Wisconsin under a distributor franchise agreement. 56 Wis. 2d at 121-24, 201 N.W.2d at 547-49. The court first found that there was no authority delegated to American to act for Peabody. 56 Wis. 2d at 123, 201 N.W.2d at 549. The court noted that the agreement between the two parties clearly provided that American was to buy auditorium seats from Peabody, and then American was to sell the seats. *Id*. Moreover, under the agreement, American was expressly prohibited from using the name Peabody when conducting

41

business.  *Id*.  The court also found that there was no evidence that Peabody controlled  in any way the details of the work performed by American.  *Id*. at 124, 201 N.W.2d at 549.

Viking argues that, as was the case in *Peabody*, there is no evidence of Johnson Bank's manifestation that Wenninger would act as Johnson Bank's agent.  There was no agency agreement between Wenninger and Johnson Bank, or evidence of a direct relationship between those two parties.  Indeed, the only contract was between Johnson Bank and Mortenson, and the contract contains no manifestation of an agency agreement.  Moreover, Viking notes that St. Paul has not offered any evidence suggesting that Wenninger informed Viking that it was purchasing the sprinklers as Johnson Bank's agent.

Turning to the second prong of the agency test, Viking contends that St. Paul has admitted that it did not retain the right to control the details of Wenninger's work.  Specifically, Viking points to the plaintiff's brief, in which the plaintiff states: "Johnson did not attempt to interfere with technical issues regarding construction as those decisions were left up to the companies who were hired to do the actual construction." (Pl.'s Br. at 15.)

In the case at hand, St. Paul has failed to provide sufficient evidence to support a finding of agency.  Specifically, St. Paul has not set forth specific facts showing that Johnson Bank retained the right to control the details of Wenninger's work.

To be sure, Johnson Bank explicitly gave its consent to Mortenson to build the building on behalf of Johnson Bank.  However, in order to establish an agency relationship, the work of Mortenson's subcontractor, Wenninger, would also have to be subject to Johnson Bank's control.  Although Johnson Bank paid for the materials of the building purchased through Wenninger, St. Paul

42

has failed to present sufficient evidence indicating that Johnson Bank retained the right to control the exact materials to be purchased by Wenninger.

Furthermore, St. Paul has admitted that Johnson Bank did not provide input as to the technical issues regarding construction, and that it left those decisions to the companies that were hired to do the actual construction, including Wenninger. Simply authorizing a general contractor to construct a building does not equate to retaining control of the details of the work. Johnson Bank left the details to the general contractor, and there is no indication that Johnson Bank had any intention or ability to monitor the type of sprinkler system or sprinkler head that was to be installed in the building. Indeed, Johnson Bank has not provided evidence that it was even notified of the type of sprinkler which would be installed, and it is difficult to conceive how it could have controlled the details of the sprinkler system to be purchased with no knowledge of the purchasing decisions made by Wenninger.

In conclusion, the plaintiff has failed to make a showing sufficient to establish the existence of an agency relationship between Johnson Bank and Wenninger. As such, there is no privity of contract between Johnson Bank and Viking, and thus no liability can be founded on breach of express or implied warranty. Consequently, and for all of the foregoing reasons, the defendant's motion for summary judgment on the plaintiff's breach of warranty claim will be granted.

**F. False Advertising**

The plaintiff's final claim is for false advertising under Wis. Stat. § 100.18. Wisconsin's false advertising statute protects the public from untrue, deceptive, or misleading representations made in sales promotions. Wis. Stat. § 100.18. The statute requires proof of three elements: (1) there must be an advertisement; (2) the advertisement must be untrue, false, or misleading; and (3)

43

the plaintiff must have suffered damages as a result of the advertisement. *Id*. The plaintiff bears the burden of proof on all three elements. *Id*.

Viking contends that the plaintiff cannot meet its burden of proof on the third element because St. Paul did not see any Viking advertisement and was not responsible for making the decision to purchase the Viking sprinklers. (Pl.'s Br. at 26.)

In determining whether the plaintiff sustained damages as a result of an advertisement, the test is "[w]hether [the] plaintiff would have acted in its absence." *MADCAP I, LLC v. McNamee*, 284 Wis. 2d 774, 796, 702 N.W.2d 16, 26 (Wis. Ct. App. 2005) (quoting Wis. JI-Civil 2418). A plaintiff asserting a claim under § 100.18 is not required to prove that he or she reasonably relied on the representation. *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2006 WI App 148, ¶ 43, 720 N.W.2d 507, 522 (Wis. Ct. App. 2006). A plaintiff must, however, show actual reliance on the representation. *Id*. (citing *Tim Torres Enterprises, Inc. v. Linscott*, 142 Wis. 2d 56, 70, 416 N.W.2d 670 (Wis. Ct. App. 1987).

St. Paul contends that the decision to use the sprinklers was based in part on materials that Viking provided to Johnson Bank, which suggested that its products came with a warranty. Johnson Bank's expectation was that high quality products, which came with warranties, would be used in the construction of the building. (PPFOF ¶ 29; Thorn Aff., Ex. G at ¶ 8.)

St. Paul further argues that Viking never intended to comply with the warranties. In support of this argument, St. Paul points to the testimony of Del Dornbos, Vice President of Technical Services for Viking, to demonstrate that Viking has never honored a warranty claim. (Pl. Br. at 19; citing Dornbos Dep. at 63.) As a result, St. Paul contends that Viking has engaged in deceptive trade

44

practices by advertising that there was a warranty when in actual practice the warranty was nonexistent.

In response, Viking argues that St. Paul has not provided any evidence that Johnson Bank or Wenninger actually relied on any Viking representation in making the decision to purchase the sprinklers. Viking points to the lack of any witnesses at either Johnson Bank or Wenninger who can testify to having reviewed any materials provided by Viking regarding a warranty. (Def.'s Reply at 12-13.)

Moreover, Viking contends that there is no false, misleading, or deceptive statement regarding its warranty. Viking disputes the plaintiff's contention that it has never honored a warranty claim. Rather, it notes that, while there has never been a finding of manufacturing defects for the model of sprinkler at issue, Viking has nonetheless paid warranty claims. (Def.'s Reply at 14; Pl. Br., Ex. F at VIK 00166.)

In the end, St. Paul has failed to set forth specific facts showing that there is a genuine issue as to whether it actually relied on Viking's representation of a warranty. St. Paul has admitted that no one at Johnson Bank reviewed Viking's materials regarding the sprinkler. (Pl. Br. at 17.) A general statement that Johnson Bank expected high quality products with warranties is not sufficient to establish that Johnson Bank, much less Wenninger, actually relied on specific Viking materials in making the decision to purchase the sprinkler. At most, St. Paul can only speculate that the warranty was part of the basis for the purchasing decision.

Finally, St. Paul is incorrect when it asserts that Viking has never honored a single warranty claim. Dornbos did not testify that Viking has never honored a warranty, but rather testified that he was "not aware . . . of any defective manufacturing or defective materials on this particular

45

sprinkler." (Dornbos Dep. at 63.)   Moreover, Viking has provided evidence that it has honored warranty claims.  Simply stated, St. Paul has failed to provide sufficient evidence of actual reliance or that the warranty materials were false, misleading, or deceptive.   Consequently, the defendants' motion for summary judgment on the plaintiff's false advertising claim will be granted.

## VI. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, the defendant's motion for summary judgment will be granted.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that defendant's motion to strike the plaintiff's expert testimony be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that the plaintiff's motion to bar opinion testimony from John Bland be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this 12th day of January 2007, at Milwaukee, Wisconsin.


_____         /s/ William E. Callahan, Jr.
                                             WILLIAM E. CALLAHAN, JR.
                                             United States Magistrate Judge

46